Pearl J. **BARKER**, et al.,
Plaintiffs-Appellants,

v.

**HENDERSON, FRANKLIN, STARNES & HOLT,** and **Taylor, Edenfield, Gilliam & Wiltshire,** Defendants-Appellees.

No. 86–1143.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1986.

Decided July 30, 1986.

Robert Plotkin, Plotkin & Jacobs, Ltd., Chicago, Ill., for plaintiffs-appellants.

Gary Kostow, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

For several years Michigan Baptist Foundation, Inc., built and operated a retirement village in Florida. It sold lifetime leases to

the apartments in Estero Woods Village (the Project). In order to finance the Project until it could receive revenue from the leases, the Foundation issued bonds secured by its interest in the land and ongoing construction. Many of the bonds were sold in small amounts to people who, we assume, were unsophisticated and unable to afford losing their investments. In October 1976 Lee County Bank, the Trustee for the bonds, refused to participate in further issues. The Foundation then sold unsecured notes for another 17 months, until, at the request of state officials, a state court enjoined the sale of further instruments. The total sales exceed $7 million in principal. None of the bonds or notes were registered under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa. We shall assume that the materials used to sell the bonds and notes omitted essential information about the risks involved in the Project.

The purchasers of bonds between January 1974 and October 1976, and of notes between November 1976 and March 1978, are the plaintiffs in this suit under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5. The Foundation issued notes before January 1974, but the interest and principal on these notes were paid in full. The original defendants include just about everyone who had any connection with the Project. A series of settlements, coupled with the sale of the Project, produced a fund from which the purchasers of the bonds have been paid between 120% and 125% of the face value of their instruments. The purchasers of the notes have recovered 35.79% of the face value. Because of the time value of money, even the bondholders have not been made whole. Six defendants did not settle, and a separate judgment under Fed.R. Civ.P. 54(b) has brought two of these before us.

Henderson, Franklin, Starnes & Holt (the Law Firm) furnished legal advice to the Foundation and its predecessors in interest (collectively the Foundation) from 1971 through 1976. Taylor, Edenfield, Gilliam & Wiltshire (the Accounting Firm) furnished accounting services during the same period. The district court reviewed the voluminous materials produced during discovery and wrote a lengthy opinion explaining why neither the Law Firm nor the Accounting Firm was sufficiently involved in the sale of the securities to be liable for any of the Foundation's sins. *Barker v. Lee County Bank*, 1985 Fed.Sec.L.Rep. (CCH) ¶ 92,404 (N.D.Ill.1985). [Available on WESTLAW, DCTU database]. The district court's thorough opinion makes it unnecessary to repeat the facts. Instead we set out some typical examples of things a jury might find and that plaintiffs believe demonstrate the Firms' complicity.

William Graddy, a partner of the Law Firm, gave advice to the Foundation at the inception of the project. Julian Clarkson, another partner of the Law Firm, was a director of the Trustee and chairman of its Trust Committee. Fred Edenfield, a partner of the Accounting Firm, gave advice to the Foundation at the outset of the project. Edenfield and Graddy were good friends. The plaintiffs' case against the two Firms is essentially that (a) the Firms sent the Foundation down the wrong path, failing at the outset to insist that it register the securities and disclose the risks involved; (b) the Firms knew of the Foundation's continued solicitation of funds but did not "blow the whistle"; (c) the Firms induced the Trustee to lend implied support to the securities through October 1976 by acting as Trustee.

Graddy and other attorneys at the Law Firm assisted the Foundation in organizing the Project under state law, drawing up its bylaws, and negotiating the purchase of the land. The purchase was complex, with the seller financing much of the sale and releasing the mortgage in strips as the Foundation paid installments. Graddy and Edenfield were among the incorporating directors of the Foundation, although they were immediately replaced by the permanent directors. Graddy knew of the plan to finance the Project through bonds, and he asked the Trustee to serve in that role.

Graddy prepared the trust indenture. The indenture, although legally sufficient, did not contain controls sufficient to prevent the losses that ensued.

The Foundation raised its first money in 1972. Graddy and Edenfield reviewed a draft of the proposed selling document in 1971. Edenfield reviewed a draft projection in 1973, the same year Graddy reviewed a draft letter of solicitation. Neither asked the Foundation to make substantial changes. We assume that both men should have realized that there were substantial risks—that the Project was thinly capitalized, and that repayment of the bonds would require sales of further bonds, leases, or both, and that even a small problem could scuttle the Project. Both Graddy and Edenfield knew that other retirement villages had run into trouble—both financial difficulties and problems under the securities laws. Graddy knew that some of the directors of the Foundation had purchased an option on land in which the Foundation was interested and later sold their interest to the Foundation in exchange for some of the Foundation's bonds. Self-dealing could imperil the Foundation's exemption from the requirement of registration. See § 3(a)(4) of the '33 Act, 15 U.S.C. § 77c(a)(4). (It is uncontested, however, that these bonds were cancelled and that the Foundation never lost its status as a tax-exempt religious or charitable organization, and that no court has held that the securities should have been registered under the '33 Act.)

In September 1973 Graddy prepared the papers to increase the maximum amount of bonds the Foundation could sell. Edenfield received a pro forma balance sheet prepared by the Foundation. In 1976 Graddy participated in meetings at which an officer of the Trustee explored doubts about the Project. After these meetings, and other exchanges, the Trustee remained on the job until October. Graddy was aware of the possibility that the Foundation's failure to secure timely releases of the seller's interest in the land could imperil the security for the bonds. (As it turned out, the releases were late in coming, but the bonds still ended up with liens superior to those of the life-lease holders, the potentially competing claimants.)

The Law Firm and the Accounting Firm received the Foundation's selling documents during 1974–78 but did nothing to stop the sale of the securities and facilitated their sale by answering the Trustee's inquiries in a fashion that led the Trustee not to drop out until October 1976. We will assume that some of the answers to the Trustee's questions concealed legal difficulties. For example, the Law Firm allowed the Trustee to conclude that there were "[n]o known defaults" under the indenture, meaning that the Foundation had not "defaulted" in the payment of principal or interest; but a jury might conclude that the Law Firm should have known that the Trustee was interested in whether any legal problems, such as potential liability under the securities law, had arisen.

The following is also undisputed:

—Neither Firm reviewed or approved any of the materials used to sell the securities between 1974 and 1978. None of the drafts that the Firms saw in 1971 and 1973 was used to sell securities during 1974–78.

—Neither Firm received any of the proceeds of the sales. Neither Firm had a representative on the Foundation's board.

—Neither Firm's name appeared on any document used to sell the securities at any time.

—At Graddy's request, the Foundation retained two other law firms to review the promotional materials and give advice about the securities laws. One or both of these firms reviewed the materials used during 1974–78. Graddy told the Foundation that he had no expertise in securities matters.

—During 1974–75 the Law Firm billed the Foundation a total of $125. It ceased representing the Foundation in any way before the first note was sold.

—The Accounting Firm prepared the Foundation's financial statements

through 1975, but none of these statements was used in any promotional material. The Foundation requested Edenfield to sign a pro forma balance sheet in 1973 for use in the promotional materials; he refused. During the audit for 1975 the Accounting Firm found that officers of the Foundation had drawn unauthorized sums and qualified its opinion of the financial statement. The Foundation then fired the Accounting Firm.

The district court held, and we agree, that these undisputed facts require summary judgment for the two Firms, even taking other inferences in the light most favorable to the plaintiffs.

## I

The Securities Act of 1933 has an intricate set of rules establishing who is liable when securities are sold by the use of false or misleading documents. Section 11, 15 U.S.C. § 77k, creates presumptive liability for the issuer, all members of its board, and all who sign the prospectus or are named as preparing it. Members of the board and other signers can use a series of "due diligence" and "reliance on expertise" defenses. Section 12, 15 U.S.C. § 77l, imposes liability on those who offer or sell the security, but if the problem was in the selling documents rather than a failure to register, it allows these people to escape liability if they "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." Section 12(2). Then § 15, 15 U.S.C. § 77o, imposes liability on anyone who "controls any person liable under sections 11 or 12" unless the controlling person "had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist."

■ Neither the Law Firm nor the Accounting Firm is an issuer, director, signatory of a prospectus, offeror, or seller of securities. Neither can be liable under § 11 or § 12 of the '33 Act. Although the plaintiffs briefly argue that the Firms are "control persons" under § 20(a) of the '34 Act, 15 U.S.C. § 78t, the provision parallel to § 15, this gets them nowhere. This provision is applicable only to people who actually exercised control over the issuers, sellers, and other people directly liable. E.g., *Metge v. Baehler*, 762 F.2d 621, 630–31 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc). The Firms had no ability to control the Foundation. Their ability to persuade and give counsel is not the same thing as "control," which almost always means the practical ability to *direct* the actions of the people who issue or sell the securities. The Firms had no such authority; they received the selling materials for 1974–78 through the mails, after they had been issued. This is not sufficient for "control" under § 15 or § 20.

■ The plaintiffs principally rely on § 10(b) of the '34 Act and Rule 10b–5. See *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), holding that these provisions support implied private rights of action even when they overlap with the express rights of action under §§ 11, 12, 15, and 20. Section 10(b) forbids the use of "any manipulative or deceptive device or contrivance". Rule 10b–5 makes it unlawful, in the connection with the purchase or sale of a security:

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

Neither the statute nor the rule identifies the addressees of these commands. A natural reading of their language is that the commands apply to the same people otherwise covered by the '33 and '34 Acts—issuers, directors, signatories and identified

drafters of documents, offerors, sellers, and those who control them. In common with the other courts of appeals, however, this court has held that § 10(b) and Rule 10b–5 establish liability for aiders, abetters, and conspirators with those primarily liable, even if the aiders, abetters, and conspirators could not be called "control persons" under § 15 or § 20. E.g., *Brennan v. Midwestern United Life Insurance Co.*, 259 F.Supp. 673 (N.D.Ind.1966), *aff'd*, 417 F.2d 147 (7th Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970) (aiding and abetting); *Dasho v. Susquehanna Corp.*, 380 F.2d 262 (7th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967) (conspiracy). These principles of implied secondary liability have been criticized, see Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L. Rev. 80 (1981), and the Supreme Court has twice reserved decision on them, see *Herman & MacLean*, 459 U.S. at 379 n. 5, 103 S.Ct. at 685 n. 5; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 191–92 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976). The Firms do not ask us to reconsider *Brennan* and *Dasho*. They argue only that secondary liability does not sweep up all people who can be characterized as participants in or contributors to the success of the firm that issues the securities. We agree. A court must take care lest the implied right of action under Rule 10b–5 unravel the presumptions and defenses created by Congress.

*Ernst & Ernst*, like this case, was a suit seeking to hold an accounting firm liable for misstatements in connection with the sale of securities. The plaintiffs contended that had Ernst & Ernst been more careful in doing its audits, it would have discovered the fraud. This court held that an accountant has a duty of inquiry and due care, a duty owed to investors as well as to issuers of securities, and that the accountant's negligent failure to carry out its duty had caused the investors' injury. The Supreme Court held, to the contrary, that people may be liable under § 10(b) and Rule 10b–5 only if they act with intent to deceive. (We have since concluded that recklessness meets the standard of wrongful intent. See *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).) The Court pointed out that both statute and rule refer to manipulative and deceptive conduct, which at common law meant conduct with bad intent. *Herman & MacLean* then concluded that because of the scienter requirement under § 10(b) and Rule 10b–5, an overlap in remedies will not undo the structure of §§ 11, 12, 15, and 20. These statutes establish liability without fault for a limited group of people, and grant defenses; implied rights of action may cover a larger group, but there must be proof of fault and intent. We take *Ernst & Ernst*, together with *Herman & MacLean*, as establishing that aiders, abetters, conspirators, and the like may be liable only if they have the same mental state required for primary liability. Cf. *United States v. Feola*, 420 U.S. 671, 692, 95 S.Ct. 1255, 1267, 43 L.Ed.2d 541 (1975). No one may be held liable without proof that he acted with scienter; otherwise the premise of *Herman & MacLean* would not be satisfied. See also *ITT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir.1980) (Friendly, J.); *SEC v. Arthur Young & Co.*, 590 F.2d 785 (9th Cir.1979).

█ For the same reason, the plaintiff must show that each person alleged to be an aider, abetter, or conspirator himself committed one of the "manipulative or deceptive" acts or otherwise met the standards of direct liability (save for the fact that he did not offer or sell the securities). In most cases it will be possible to get part way by showing that the defendant knew that the issuer or seller had omitted a material fact necessary to make the selling document not misleading, and had failed to disclose this. But knowledge of a material omission is not enough to violate the act or rule. There must also be a duty to disclose. See *Dirks v. SEC*, 463 U.S. 646, 653–54, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983); *Chiarella v. United States*, 445 U.S. 222, 227–35, 100 S.Ct. 1108, 1114–18,

63 L.Ed.2d 348 (1980). When the nature of the offense is a failure to "blow the whistle", the defendant must have a *duty* to blow the whistle. And this duty does not come from § 10(b) or Rule 10b–5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law. *Dirks*, 463 U.S. at 653–64, 103 S.Ct. at 3260–61; *Chiarella*, 445 U.S. at 227–35, 100 S.Ct. at 1114–18.

Several courts have established *additional* requirements for secondary liability. E.g., *ITT v. Cornfeld*, 619 F.2d at 922, which lists as additional requirements (a) the existence of a primary violator; (b) knowledge by the aider and abetter of the primary violation; and (c) "substantial assistance" by the aider and abetter in the perpetration of the primary violation. Courts have tightened up the standards of scienter for secondary violators. E.g., *Woods v. Barnett Bank*, 765 F.2d 1004, 1010 (11th Cir.1985) ("severe recklessness" instead of mundane "recklessness"). See also Louis Loss, *Fundamentals of Securities Regulation* 1185 (1983) (suggesting that actual knowledge is required for secondary liability). And "substantial assistance" means more than just a little aid. E.g., *Stokes v. Lokken*, 644 F.2d 779, 784 (8th Cir.1981) (a lawyer whose opinion letter was important to an auditor's statement in a prospectus is not liable as an aider and abetter). Few of these cases distinguish the elements of "conspiracy" from the elements of "aiding and abetting". We need not do so either, because the plaintiffs did not offer evidence to show even the minimal requirements under *Ernst & Ernst* and *Herman & MacLean:* scienter and the defendants' commission of a proscribed act.

## II

The plaintiffs emphasize that the case is here on summary judgment and that they are therefore entitled to the benefit of all reasonable inferences. They are, but unless they have produced enough evidence to allow a jury to find in their favor, they lose. See *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), holding that a court should grant summary judgment when it is persuaded that, on the same evidence, it would have to reverse a jury verdict in favor of the party opposing summary judgment. The inquiry on a motion for summary judgment "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *Id.* at ——, 106 S.Ct. at 2511 (citation omitted; brackets in original). A jury presented with all the evidence in this case could come to but one conclusion. Summary judgment therefore was proper.

■ There is no direct evidence that either Firm acted with intent to deceive any purchaser of the Foundation's securities. There is indeed no evidence that either Firm saw any of the Foundation's selling documents during the period 1974–78 until after the document had been placed in use. There is no serious claim that either Firm intentionally or recklessly gave bad advice to the Foundation. The Accounting Firm was fired after catching a problem in the Foundation's internal affairs. A jury might conclude that the Law Firm was negligent in drafting a "loose" indenture and in obtaining belated releases of the mortgage on the land, but negligence does not establish the necessary scienter, and neither of these errors (if they were errors) was the subject of a scheme to defraud. The securities laws do not impose liability for ordinary malpractice, even though that malpractice may diminish the value of the issuer and thus of the issuer's securities. (We do not say whether there was malpractice here.)

■ The plaintiffs insist that the Firms *must* have known that the Foundation's selling documents were inaccurate and, because they did not do anything to stop the sales and answered queries from the Trustee, they *must* have had the necessary mental state. If this were enough to establish scienter, however, the scienter doctrine

would not do anything to distinguish liability under § 10(b) and Rule 10b–5 from the presumptive or absolute liability under §§ 11, 12, 15, and 20. A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant "must have had" knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.

■ Law firms and accountants may act or remain silent for good reasons as well as bad ones, and allowing scienter or conspiracy to defraud to be inferred from the silence of a professional firm may expand the scope of liability far beyond that authorized in *Ernst & Ernst* and *Herman & MacLean*. If the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover-up) was in the interest of the defendants. Did they gain by bilking the buyers of the securities? Cf. *Dirks*, 463 U.S. at 662–64, 103 S.Ct. at 3265–66. In this case the Firms did not gain. They received none of the proceeds from the sales. They did not receive fees for rendering advice in connection with the sales to the plaintiffs. Both Firms billed so little time to the Foundation between 1974 and 1976 (and none after October 1976) that it is inconceivable that they joined a venture to feather their nests by defrauding investors. They had nothing to gain and everything to lose. There is no sound basis, therefore, on which a jury could infer that the Firms joined common cause with other offenders or aided and abetted a scheme with the necessary state of mind.

The district court also held that the Firms had not committed any forbidden act, had not participated in a scheme to defraud by remaining silent when there was a duty to speak. This, too, is a correct conclusion. Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose. *ITT v. Cornfeld*, 619 F.2d at 925; *SEC v. Spectrum, Ltd.*, 489 F.2d 535 (2d Cir.1973). Cf. *United States v. Matthews*, 787 F.2d 38

(2d Cir.1986). To the contrary, attorneys have privileges not to disclose. See *Upjohn Corp. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

The extent to which lawyers and accountants should reveal their clients' wrongdoing—and to whom they should reveal—is a question of great moment. There are proposals to change the rules of legal ethics and the SEC's regulations governing accountants. The professions and the regulatory agencies will debate questions raised by cases such as this one for years to come. We express no opinion on whether the Firms did what they should, whether there was malpractice under state law, or whether the rules of ethics (or other fiduciary doctrines) ought to require lawyers and accountants to blow the whistle in equivalent circumstances. We are satisfied, however, that an award of damages under the securities laws is not the way to blaze the trail toward improved ethical standards in the legal and accounting professions. Liability depends on an *existing* duty to disclose. The securities law therefore must lag behind changes in ethical and fiduciary standards. The plaintiffs have not pointed to any rule imposing on either Firm a duty to blow the whistle.

AFFIRMED.