982 F.2d 1130
 Fed. Sec. L. Rep. P 97,300
Terrence DONOHOE, Bernard Medville, Clarence Drucker, et
al., Plaintiffs-Appellants,
v.
CONSOLIDATED OPERATING & PRODUCTION CORPORATION, Ona
Drilling Corporation, Onshore Rig Corporation, et
al., Defendants-Appellees.
 No. 91-1970.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 21, 1992.
Decided Dec. 28, 1992.
 
 Herbert Beigel, Bruce M. Rose, Leigh R. Lasky, Norman Rifkind (argued), Beigel & Sandler, Chicago, IL, for plaintiffs-appellants.
 Douglas P. Roller (argued), Clifford E. Berman, Susan Clancy Boles, Rooks, Pitts & Poust, Chicago, IL, for defendants-appellees Consolidated Operating & Production Corp., C. Morando Berrettini and Jack Nortman.
 Douglas P. Roller, Clifford E. Berman, Rooks, Pitts & Poust, Chicago, IL, for defendants-appellees Ona Drilling Corp., Onshore Rig Corp. and Dennis Bridges.
 Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 This is a familiar tale of an oil-drilling project come to grief. The fifty-four plaintiffs invested in one or more of four limited partnerships that proposed to drill for oil near Corsicana, Texas. The wells turned out to be dry (although they may produce some gas), and the investors are out of pocket. They sued the corporate general partner of the limited partnerships (Consolidated Operating & Production Corp.), the shareholders of the general partner (Dennis Bridges, Morrando Berrettini and Jack Nortman) and the companies that drilled the wells (Ona Drilling Corp. and Onshore Rig Corp.). There is evidence that the man responsible for the drilling, Dennis Bridges, is dishonest. But Bridges is in bankruptcy, and the drilling companies he owned and ran did not respond to the complaint. (The court entered default judgment against the drilling companies, but they may not be worth much.)
 
 
 2
 On the motion of the remaining defendants, the district court concluded that if Bridges was a crook, he not only deceived the plaintiffs, he deceived Nortman and Berrettini as well. Without a dispute as to the fraudulent intent of the latter, the court granted summary judgment against the investors. For technical reasons, the court also granted summary judgment for the defendants on those claims that did not require a showing of fraudulent intent. The Illinois state law claim for breach of fiduciary duty was dismissed without prejudice. We affirm in part, vacate in part and remand for further proceedings.
 
 I.
 
 3
 The facts of this case are presented in exhaustive detail in the published opinions of the district court. Donohoe v. Consolidated Operating & Production Corp., 736 F.Supp. 845 (N.D.Ill.1990) (Donohoe I ); and Donohoe v. Consolidated Operating & Production Corp., 763 F.Supp. 315 (N.D.Ill.1991) (Donohoe II ). We will assume familiarity with those opinions and present only a condensed (but still unfortunately lengthy) version here. In addition, we will reserve discussion of some details for the portions of the opinion to which they relate.
 
 
 4
 In the fall of 1982, Morrando Berrettini, then the vice president of finance for Itex Energy Corp., a firm engaged in the oil and gas business, met Dennis Bridges, a driller. Berrettini was interested in setting up an oil drilling project; Bridges was receptive, and suggested that it would be profitable to drill shallow wells in an area near Corsicana, Texas. Shallow wells would not produce much oil, but they would be cheaper to drill and less risky as an investment. At this point Berrettini brought in Jack Nortman, a business associate, and the two men conferred with Stan Cole, whom they knew to have experience in the oil and gas industry. Nortman knew Cole because he was married to Etta Cole, Nortman's lawyer.
 
 
 5
 Cole looked over the proposed project and opined that it made sense on paper. Nortman and Berrettini then investigated Bridges and the prospects of finding oil in the Corsicana shallows. Cole, too, did his own investigation. By the spring of 1983, both investigations had turned out positive as to Bridges and as to the prospects for oil. Nortman, Berrettini, Cole and Bridges set up Consolidated Operating & Production Corporation (COPCO), assigned the target oil lease to COPCO and hired Michael Firsel, an attorney. Firsel, Cole and Bridges drafted a Private Placement Memorandum (PPM) for a limited partnership with COPCO as its general partner. Berrettini provided the financial projections for the PPM based on numbers provided by Bridges.
 
 
 6
 COPCO-1, the first of four limited partnerships, was offered for sale in April, 1983. Interbanc Equity Corporation, headed by Cole, was the broker and took a 10% commission on the sale of each partnership unit. The PPM outlined the structure of the deal. The limited partnership would contract with Ona Drilling Corp. (Ona) to drill wells on a "turnkey" basis: for a fixed price, Ona agreed to drill the wells and install the requisite equipment so that the partnerships could "turn the key" and deliver oil to buyers. Wells would not be completed unless merited. The PPM set out the price of the turnkey contract, $60,000 per well, noted that a substantial profit was built into the price but opined that the price was competitive for the area. The PPM also disclosed an arrangement that might have given a thoughtful investor pause--shareholders of COPCO, the general partner of the partnership, were to receive a share of Ona's profits.
 
 
 7
 Drilling began in August 1983. Bridges reported that the wells were showing oil, and visits to the drill site by Nortman and Berrettini seemed to confirm that things were going well. Nortman and Berrettini went full speed ahead and offered COPCO-2 in October and COPCO-3 in November. Again, Cole and Interbanc brokered the offerings, and the PPMs were similar to those for COPCO-1, although the memoranda described the drilling programs as "developmental" rather than "exploratory." In December 1983, an independent test indicated that one of the COPCO-1 wells was a prolific producer of gas. Around the same time, Bridges also forwarded $102,000 to Nortman and Berrettini as an "advance" on Ona's profits. Nortman and Berrettini put these funds into a segregated account. Throughout this period, Nortman and Berrettini prepared a number of positive reports to the investors, based on information provided by Bridges and other Ona employees. COPCO-1 made a capital call. COPCO-4 was offered in March 1984, this time with Bridges as general partner.
 
 
 8
 In the spring of 1984, the project began to sour. In April 1984, Ona reported to COPCO (and COPCO reported to the investors) that Scurlock Oil Company had picked up 39 barrels of oil from COPCO-1: in other words, commercial production was under way. COPCO distributed the proceeds to the limited partners. But the oil Scurlock picked up was "frac" oil--oil that Ona had pumped into the wells to stimulate production, not oil coming from the ground. During the same period, the COPCO-1 wells became troublesome. Some produced excessive amounts of water. Others developed "gas lock," a condition that the parties do not describe but which appears to be good news if you want gas and bad news if you want oil. These wells were capped pending an arrangement to gather the gas (apparently a service that Ona could not and did not agree to provide).
 
 
 9
 During the summer of 1984, Bridges came into conflict with Nortman and Berrettini. Bridges complained to Firsel that COPCO was not releasing funds to Ona. Nortman and Berrettini claimed that COPCO had paid Ona all sums that were due under the turnkey contracts. They argued about the disposition of $230,000 sitting in an Ona account in Chicago. Bridges maintained that the money represented Ona's profits from the drilling contracts and wanted to split it with Nortman and Berrettini. Nortman and Berrettini refused and had Bridges transfer the money to their control as a reserve to be spent on the fields if needed. Despite this agreement, one month later Bridges was again complaining to Cole that COPCO was not paying Ona's bills.
 
 
 10
 Not all signs were bad, however. During the summer of 1984, someone hired Joseph Galoostian[1] to provide an independent evaluation of the fields. His report was positive. Berrettini and Firsel also visited the fields, saw oil in collection tanks and managed to review some, but not all, of Ona's records.
 
 
 11
 In September 1984, Bridges, Cole, Nortman and Berrettini met to agree on a schedule for the completion of the wells. When Berrettini travelled to Texas later that month, however, he discovered that the work agreed to had not been started. Nonetheless, he paid some of Ona's outstanding bills and replenished its bank account (Ona was bouncing checks by this time) from the $102,000 forwarded in December 1983. In October, Berrettini went to Texas again, only to find that the work was still delayed and the money he deposited was gone.
 
 
 12
 In November, Interbanc insisted on a new arrangement. Ona prepared a revised estimate of completion costs, to be paid from an escrow account. Further, Ona released its liens on the wells in COPCO-1, 2 and 3. In return, Nortman and Berrettini funded the escrow account with $115,000. They claim that the money came from COPCO's pocket and from their personal funds. The plaintiffs allege that most of the money came from the limited partners, diverted to Nortman, Berrettini and COPCO in the guise of advances on Ona's profits.
 
 
 13
 The wells belonging to COPCO 1, 2 and 3 were finally completed in January 1985. Cole and another Interbanc employee, Curtis Bergquist, visited the field and confirmed the completion of the work. Nortman and Berrettini did the same. COPCO-4 then went forward on a similar basis, with funds coming from an escrow account. At the same time, COPCO funded yet another escrow account with $20,000 for the operating costs of COPCO-2 and 3.[2]
 
 
 14
 In the spring of 1985, most of the wells in COPCO-1, 2 and 3 were "gassing up" and had to be capped. Ona reported: "Congratulations gentlemen! It appears you have a commercial gas field!" This silver lining had a dark cloud attached, however. Before anyone would buy the gas, the wells required extensive and expensive deliverability tests.
 
 
 15
 The remainder of the story has some interesting details, but is largely irrelevant to our discussion. The development of COPCO-4 proceeded apace, but with the aid of Cole and Bergquist, Bridges managed to get the investors to send their capital contributions directly to him, bypassing Nortman and Berrettini. In the fall of 1985, Bridges ducked out: he resigned as president and director of COPCO. Nortman and Berrettini eventually found another operator for the COPCO projects, Bob Stovall. Stovall was to evaluate COPCO-1, 2, 3 and 4 and bring them into production. Bridges, however, would not allow Stovall to do any work on COPCO-4--prompting COPCO to sue him. In July 1986, Stovall reported that $80,000 would be required to turn COPCO-1, 2 and 3 into productive gas fields. Without the requisite funds, COPCO stopped operating the wells.
 
 
 16
 Understandably irritated, the investors in COPCO-1, 2, 3 and 4 filed this suit in October 1986. The investors charge that COPCO and the partnerships were set up to engage in "dry-well drilling," a classic oil industry scam in which a driller persuades investors to pay him inflated prices to sink dry wells. The investors allege that there is no oil in the Corsicana sands and that there was never any prospect of finding any. COPCO and Ona completed wells without any concern for whether the additional expense was merited and lied about their progress to induce the investors to commit more money. Now the investors are stuck with wells that may produce gas, but only after the investors commit substantially more money.
 
 
 17
 According to the plaintiffs, this fraudulent scheme gives rise to causes of action under: section 10(b) of the Securities Exchange Act of 1934 (the '34 Act), 15 U.S.C. § 78j(b) (1988); Rule 10b-5, 17 C.F.R. § 240.10b-5 (1992); section 12(2) of the Securities Act of 1933 (the '33 Act), 15 U.S.C. § 77l (2) (1988); common law fraud; the common law obligations of a fiduciary; RICO, 18 U.S.C. §§ 1962(a), (c) & (d) (1988); and sections 12(A), 12(B) and 12(F)-(I) of the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121 1/2, p 137.12 (1991). Further, the investors brought strict liability claims under the federal and Illinois securities laws against the defendants for selling unregistered securities. They seek rescission of their investments under section 12(1) of the '33 Act, 15 U.S.C. § 77l (1) (1988) and under section 13(A) of the Illinois Securities Law, Ill.Rev.Stat. ch. 121 1/2, p 137.13(A) (1991).
 
 II.
 
 18
 The most important issue is the question of Nortman and Berrettini's good faith, or lack thereof. The district court divided its analysis into three sections. First, Judge Shadur opined that the undisputed facts--Nortman and Berrettini's expenditure of large amounts of cash (more than they ever received from Ona) to shore up the failing project--made the allegations of fraud implausible. Donohoe I, 736 F.Supp. at 864-66. The implausibility of the scheme, the judge decided, raised the threshold for the required showing of fraudulent intent. Id. at 864 (citing Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Second, the court ran through the alleged misrepresentations, and found that genuine issues of material fact existed as to most of them. With only one exception, the parties do not argue about the court's conclusions, and we may simply list the colorable misrepresentations and omissions the court found:
 
 Misrepresentations in the PPMs:
 
 19
 1) The price of the turnkey drilling contract was competitive for the area.[3]
 
 
 20
 2) There was a likelihood of successful drilling in the Corsicana field.
 
 
 21
 3) The wells would be completed only if completion were merited.
 
 
 22
 4) (Relating to the PPMs for COPCO-2 through 4) Prior wells already drilled on the property were completed and producing.
 
 
 23
 5) (COPCO-2 & 3) COPCO had drilled successfully before.
 
 
 24
 6) (COPCO-4) Previously drilled wells were pumping oil into tanks.
 
 
 25
 7) (COPCO-4) Previously drilled wells were at more advanced stages of completion than was the fact.
 
 Omission in the PPM:
 
 26
 8) (COPCO-4) The PPM does not mention that the attached geology report was useless.
 
 
 27
 Misrepresentations in reports to investors:
 
 
 28
 9) The wells would soon produce oil and revenues.
 
 
 29
 10) The cash distribution to investors implicitly represented that the wells were pumping oil.
 
 Omission generally:
 
 30
 11) At no point did the defendants tell the investors that the oil field was substantially depleted.
 
 
 31
 Donohoe I, 736 F.Supp. at 866-872.
 
 
 32
 In sum, Judge Shadur concluded that there was solid evidence of dry well drilling. The question, however, is whether Nortman and Berrettini knew or recklessly ignored the risk that Bridges was drilling dry wells. Rankow v. First Chicago Corp., 870 F.2d 356, 367 (7th Cir.1989) (defining scienter required for federal securities fraud). The investors rely on various items of evidence to create that inference. First, Berrettini proposed the COPCO program to Bridges, not the other way around. Second, Berrettini knew the oil industry, having worked for Itex. Third, Nortman and Berrettini were sharing in the profits of Ona and actually received "advances on profits" while the wells were being drilled.[4] Fourth, those profits were grossly inflated because the turnkey price of the wells was not competitive, a fact not disclosed to the investors. Fifth, Nortman and Berrettini's bookkeeper was a signatory on one of Ona's checking accounts. Sixth, Nortman and Berrettini made a number of trips to the oil field.
 
 
 33
 Some clarification is in order. There is a genuine dispute about the existence of a fraud rather different from the one alleged. Although Nortman and Berrettini disclosed that they would be receiving a share of Ona's profits from the drilling and disclosed the price of the drilling contract, they did not disclose that the price of the contract was inflated. In other words, there is a genuine question whether Nortman and Berrettini defrauded the investors by taking undisclosed profits from the investment project. But there are two things to note about this potential fraud. First, the investors did not allege this conflict of interest fraud in their complaint, did not argue it as an independent basis for liability before the district court and specifically disclaimed reliance on this theory at oral argument before this court. Second, the conflict of interest fraud is entirely independent of the theory on which the investors do rely--that there was no oil to be found in the Corsicana sands, and Nortman and Berrettini knew it.[5]
 
 
 34
 Turning to the theory of fraud on which the investors do rely, there is no evidence to suggest that Berrettini's decision to contact Bridges in the first place was reckless. Berrettini presented evidence that he investigated Bridges' background and got nothing but good reports. The only contrary evidence is the sworn testimony of a disappointed investor in another Bridges project. But there is no indication that Nortman or Berrettini knew about this prior project, and there is evidence that every investigative lead they turned up on Bridges and shallow wells in Corsicana was positive. The late Stan Cole, one of the plaintiffs in this case, came to the same conclusion, despite his concededly greater expertise in the oil and gas industry.
 
 
 35
 The investors also press an inference that Berrettini and Nortman knew or ignored evidence that the wells were not producing. But the defendants presented evidence that they were finance types who did not have the technical skills to evaluate an oil well in the field. Nortman and Berrettini assert that they relied on Bridges for technical expertise, and they disclosed their reliance on Bridges in the PPMs. When Bridges reported to them that the wells were pumping oil, they had no way to know that this was not true, even though they visited the wells themselves. Like the district court, we find the investors' contention that Berrettini's employment at Itex provided him with technical expertise to be implausible. Donohoe I, 736 F.Supp. at 873.
 
 
 36
 Of course, none of these arguments negates the possibility that Nortman and Berrettini were in on the scam from the start. But on summary judgment, we need only draw reasonable inferences in favor of the non-movant, not every possible inference. Henn v. National Geographic Soc'y, 819 F.2d 824, 830 (7th Cir.), cert. denied, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). This is where Judge Shadur's observations about the inherent plausibility of the fraud come in. Since Nortman and Berrettini spent large amounts of the funds they controlled to prop up the project, it is difficult to believe that COPCO was a fraud from the start. Why would Nortman and Berrettini squander their ill-gotten gains, if they knew that the field would never produce oil? Under the circumstances, an inference that Nortman and Berrettini had bad hearts from the beginning is unreasonable.
 
 
 37
 Since we affirm the district court's decision that the investors failed to present sufficient evidence to create a genuine dispute about Nortman and Berrettini's bad faith or recklessness, we must necessarily affirm the grant of summary judgment as to all of the investors' claims that are predicated on such a finding. Given this conclusion, the plaintiffs concede that Nortman and Berrettini must be absolved of direct liability for securities fraud, RICO violations and common law fraud.
 
 III.
 
 38
 The investors argue that Nortman and Berrettini's state of mind is irrelevant to their liability as control persons under section 15 of the '33 Act and section 20(a) of the '34 Act. 15 U.S.C. §§ 77o & 78t(a) (1988). The district court did not address this argument. Bad faith is also irrelevant, the investors contend, to their claim of joint venture liability under Illinois law, an argument the district court rejected. Donohoe I, 736 F.Supp. at 873-74.
 
 A. Control Person Liability
 
 39
 It is difficult to believe that a distinguished district court judge, with a well-earned reputation for writing meticulous, scholarly opinions, could dedicate 96 manuscript pages to a complaint without addressing every significant claim. The defendants press this observation, arguing that the investors waived their argument by failing to raise it below. Although the plaintiffs have approached the outer limits of waiver, we do not believe that they in fact waived their claim.[6] First, control person liability is plainly and expressly alleged in the plaintiffs' complaint. Complaint p 5.7 (R. 66 at 3). Second, although the investors devoted only one sentence to control person liability in their memorandum in opposition to the motion for summary judgment (R. 164 at 25), the issue of control person liability did not get much attention in the motion to which they were responding. (R. 153, passim ).
 
 
 40
 As an initial matter, we should note that only section 20(a) of the '34 Act is at issue here. Section 15 of the '33 Act imposes liability on control persons for violations of sections 11 and 12 of the '33 Act. The investors made no claims under section 11, and in parts IV and V of this opinion we affirm the district court's judgment against the plaintiffs on their claims under sections 12(1) and 12(2).
 
 Section 20(a) provides as follows:
 
 41
 Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 42
 15 U.S.C. § 78t(a) (1988). To establish control person liability, a plaintiff must show that the defendant has "the practical ability to direct the actions of the people who issue or sell the securities." Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 494 (7th Cir.1986). Nortman and Berrettini argue that they had no "practical" control over Bridges for the same reason that they had no knowledge of his fraudulent activities--they just didn't have the necessary expertise. But the ability to control does not depend on the qualifications of the control people. Instead, it refers to their "authority." Id. The SEC's definition of control is to the same effect: "[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1992) (emphasis added). If the rule were otherwise, corporate officers and directors could escape control liability by remaining as ignorant as possible--surely not the result that Congress intended.
 
 
 43
 This court recently articulated a two-prong test for determining control person liability. The court will look first to whether the alleged control person actually exercised general control over the operations of the entity principally liable. Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 880-81 (7th Cir.1992). Control person liability will attach if such a person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised. Id.[7] Applying these standards to this case, there is sufficient evidence that Nortman and Berrettini controlled Bridges. Together, the defendants owned 60% of COPCO's stock. They could outvote Bridges on the board of COPCO, and COPCO ran the limited partnerships. Further, until Bridges managed to take control of COPCO-4, Nortman and Berrettini controlled the flow of money to Ona. As to Nortman and Berrettini's participation, it is difficult to imagine how they could have had more involvement in the fraud without perpetrating it themselves. They helped to put the offerings together, solicited investments and made reports to investors. Nortman and Berrettini were not disinterested outside directors, but rather were principal officers of a three-man corporation, heavily involved in the day-to-day running of COPCO and the partnerships.
 
 
 44
 We come now to a more difficult question. Because good faith is a defense to control person liability, Nortman and Berrettini's good faith is clearly at issue. But the burden of proof is on them, not on the plaintiffs. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1574-75 (9th Cir.1990) (en banc) (collecting cases), cert. denied, --- U.S. ----, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). The shift in the burden of proof may have significant consequences in the summary judgment context. When a non-movant bears the burden of proof, he must present admissible evidence to support his position. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This requirement permits us to affirm the summary judgment against the plaintiffs on their primary fraud claims. When the non-movant does not bear the burden, however, there is no such requirement. Id. Nonetheless, it is conceivable that the moving parties, here, Nortman and Berrettini, might present such overwhelming evidence of good faith that they are entitled to judgment. In theory, since our review is de novo, we could decide this question here. But the parties have not briefed the issue, the district court did not discuss it, and we think that the matter deserves more consideration. On such a sparse record we are unwilling to address the merits of the summary judgment motion lest we unadvisedly deny one side the right to a trial. Accordingly, we remand this issue to the district court for further proceedings.
 
 B. Joint Venture Liability
 
 45
 Under Illinois law, joint venturers may bear responsibility for the defalcations of their partners performed within the scope of the joint venture. FDIC v. Braemoor Assocs., 686 F.2d 550, 555-56 (7th Cir.1982), cert. denied, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983); Tassan v. United Dev. Co., 88 Ill.App.3d 581, 43 Ill.Dec. 769, 775-76, 410 N.E.2d 902, 908-09 (1st Dist.1980). The investors alleged that Nortman and Berrettini were joint venturers with Bridges in drilling the wells. There is some support for this theory in that Bridges agreed to share Ona's profits with the defendants.
 
 
 46
 Before a joint venture may be found, however, there must be evidence that the joint venturers have agreed to share in both profits and losses. Palin Mfg. Co. v. Water Technology, Inc., 103 Ill.App.3d 926, 59 Ill.Dec. 553, 558, 431 N.E.2d 1310, 1315 (1st Dist.1982). As the district court observed, the plaintiffs presented no evidence that they and Bridges agreed to share in the losses of Ona. Summary judgment was therefore appropriate. Donohoe I, 736 F.Supp. at 874 (citing Clapp v. JMK/Skewer, Inc., 137 Ill.App.3d 469, 92 Ill.Dec. 187, 189-90, 484 N.E.2d 918, 920-21 (3d Dist.1985)). On appeal, the investors do not point to any evidence that Nortman and Berrettini did agree to share the losses and make no attempt to distinguish Clapp. Hence, the determination of the district court with respect to this matter must be affirmed.IV.
 
 
 47
 We now turn to the integration of the COPCO offerings. Section 5 of the '33 Act prohibits the sale of unregistered securities. 15 U.S.C. § 77e (1988). Section 12(1) gives investors a right of rescission for violations of section 5. 15 U.S.C. § 77l(1) (1988). There is no question that the COPCO limited partnership shares were unregistered securities, but section 5 is subject to a number of exceptions and limitations. See '33 Act, §§ 3 & 4, 15 U.S.C. §§ 77c & 77d (1988). In this case, COPCO offered limited partnership shares in COPCO-1 through 4 pursuant to SEC Rule 505, 17 C.F.R. § 230.505 (1992), which permits relatively small offerings (of less than $5 million) to be made to 35 or fewer investors. Each of the four offerings satisfied the requirements of Rule 505 individually. The defendants concede, however, that if the offerings are combined (or "integrated"), the resulting large offering violates section 5.
 
 
 48
 The doctrine of integration prevents issuers of securities from avoiding the requirements of section 5 by breaking offerings into small pieces. The SEC, which is entitled to some deference in this area, considers five factors when deciding whether a number of offerings should be integrated:
 
 
 49
 a) whether the offerings are part of a single plan of financing; b) whether the offerings involve issuance of the same class of securities; c) whether the offerings are made at or about the same time; d) whether the same kind of consideration is to be received; and e) whether the offerings are made for the same general purpose.
 
 
 50
 SEC v. Murphy, 626 F.2d 633, 645 (9th Cir.1980) (citing Securities Act Release No. 4552 (Nov. 6, 1962)); see 17 C.F.R. § 230.502 (1992).
 
 
 51
 Factors b and d weigh in favor of integration. Factor c, the timing of the offerings, is fairly neutral: the offerings were clearly not made at the same time, but they were still moderately close together. Judge Shadur, however, opined that factors a and e pushed strongly the other way. Each offering, he noted, raised money for a discrete, identifiable set of wells. The profits and losses from each set were not shared with the other partnerships. The court wrote:
 
 
 52
 To credit plaintiffs' theory would make it inordinately complex and expensive for anyone to fund, by way of limited partnerships, separate drilling programs in the same area--because by definition all such programs would have the same general purpose: to drill for oil.
 
 
 53
 Donohoe I, 736 F.Supp. at 877. The court went on to emphasize that "the policy reason underlying the exemption is that the qualifying private offerings should not be burdened with the cumbersome requirements and inordinate expense imposed by the statutory registration procedure...." Id. at 877, n. 28.
 
 
 54
 We are not sure that the district court's construction of the last factor is necessarily correct. The term "same general purpose" suggests a level of generality to the integration analysis that may be satisfied by the observation that the purpose of each partnership was to drill for oil. Cf. Johnston v. Bumba, 764 F.Supp. 1263, 1272 (N.D.Ill.1991). But without expressing a definite opinion on that subject, we nonetheless affirm the court's holding for essentially the same reasons it cited. The important point here is that each drilling project was designed to stand or fall on its own merits. It may have been to Ona's advantage that the wells were clumped together, since economies of scale would bring down drilling costs. But because the turnkey price was fixed, those savings were not passed on to the partnerships. Accordingly, there was no common enterprise, no single plan of financing and no single issuer attempting to evade section 5's requirements.
 
 V.
 
 55
 Donohoe I disposed of all of the investors' federal law claims except for the allegation that the PPMs for COPCO-1 through 4 contained false and misleading statements in violation of section 12(2) of the '33 Act. 736 F.Supp. at 876 & 878. In Donohoe II, the district court decided that this last claim was time-barred. 763 F.Supp. at 320.
 
 
 56
 Terrence Donohoe, the lead plaintiff in this case, began to suspect that something might be amiss with the COPCO projects in July 1984. After a certain amount of investigation, including an unsuccessful attempt to audit COPCO's books, Donohoe arranged three investors' meetings in April, July and August 1985 to discuss his concern, shared by a number of the other investors, that they were being had. The words "fraud," "sham" and "con" were used repeatedly. But the investors did not file suit for more than a year, in October 1986.
 
 
 57
 The statute of limitations on a claim under section 12(2) is one year from the date the buyer knows or should know, in the exercise of reasonable diligence, about the false statements.[8] '33 Act, § 13, 15 U.S.C. § 77m (1988). The investors argue that they were as diligent as possible and still did not discover the fraud until July 1986. But our cases make clear that the relevant date for section 13 purposes is the date on which the buyer is on "inquiry notice" of the potential for fraud. DeBruyne v. Equitable Life Assur. Soc'y of the United States, 920 F.2d 457, 466 (7th Cir.1990). Investors are not entitled to nail down "every last detail of a transaction" before they may be charged with knowledge sufficient to start the running of the limitations period. Martin v. Consultants & Administrators, Inc., 966 F.2d 1078, 1086 (7th Cir.1992) (ERISA violations). The plaintiffs were clearly on inquiry notice many months before October 1985. Accordingly, their claim under section 12(2) is time-barred.
 
 VI.
 
 58
 For the foregoing reasons, the judgment of the district court is VACATED in part on the control person liability of Nortman and Berrettini and REMANDED for further proceedings not inconsistent with this opinion. The judgment of the district court is AFFIRMED in all other respects.
 
 
 59
 AFFIRMED in part, VACATED in part and REMANDED.
 
 
 
 [1]
 Neither the parties nor the district court have identified Galoostian's employer, but there is some indication that he was hired by a group of the investors, who were becoming concerned about COPCO by this time
 
 
 [2]
 It is completely unclear where this money came from. The investors argue that COPCO used investor funds from COPCO-4, a clear violation of COPCO's fiduciary duties. The district court thought this inference unreasonable, a conclusion in which we concur. Donohoe I, 736 F.Supp. at 854 n. 14
 
 
 [3]
 This is the one alleged misrepresentation that Nortman and Berrettini do challenge. Although their argument may have some merit, the plaintiffs have presented enough evidence to keep the matter in dispute
 
 
 [4]
 Etta Cole submitted an affidavit stating that Bridges sent an advance to Nortman and Berrettini because they demanded it, not of his own accord. The district court did not consider this affidavit, because it contradicted Cole's earlier responses to an interrogatory, stating that she had no personal knowledge that the defendants had intentionally misappropriated the investors' funds or engaged in other wrongdoing. Donohoe I, 736 F.Supp. at 861-63 (citing, inter alia, Richardson v. Bonds, 860 F.2d 1427, 1433 (7th Cir.1988)). The court's refusal to consider the affidavit was appropriate
 
 
 [5]
 In fact, Nortman and Berrettini would have been significantly better off if Ona had found oil
 
 
 [6]
 They have, however, waived their claim of control person liability under the Illinois Securities Law by failing to raise it here or to make any reference to the argument when opposing the motion for summary judgment
 
 
 [7]
 The circuits are split on the appropriate test for determining control person liability. Some circuits have adopted the so-called "culpable participant" test and require some evidence that the alleged control person actually participated in the transaction upon which the principal violation is predicated. See, e.g., Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir.1973) (en banc). Others have rejected the requirement that the controlling person exercise control over the particular transaction giving rise to the violation. See, e.g., Metge v. Baehler, 762 F.2d 621 (8th Cir.1985), cert. denied, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). In Harrison, we carefully canvassed our own precedent and concluded that we have rejected the culpable participant requirement. Harrison governs our decision in this case
 
 
 [8]
 In no event may a buyer sue more than three years after the date of sale. ' 33 Act, § 13, 15 U.S.C. § 77m (1988). The district court decided that the investors' claim with respect to the PPM for COPCO 1 was time-barred under this "drop-dead" provision of section 13. Donohoe II, 763 F.Supp. at 319. Since all of the claims are barred by the one-year limit, we need not reach this issue