**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Steven R. JAKUBOWSKI, Defendant.**

No. 94 C 4539.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 2, 1996.

Robert J. Burson, Securities & Exchange Commission, Chicago, IL, Nancy J. Guarino, United States Securities & Exchange Commission, Chicago, IL, for Securities and Exchange Commission.

Christopher James Barber, Christopher C. Kendall, Coffield, Ungaretti and Harris, Chicago, IL, for Steven R. Jakubowski.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Defendant Steven R. Jakubowski moves the court to dismiss Plaintiff Securities and Exchange Commission's complaint against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the court denies Jakubowski's motion.

### Background

For the purposes of this motion to dismiss, the Court accepts the following facts as true. At all times relevant to this case, Defendant Steven R. Jakubowski was an attorney at a law firm in Chicago. (Complaint ¶ 8.)[1] Frank Hart was president of Generation Capital Associates ("GCA"), a venture capital firm headquartered in New York. (Complaint ¶ 11.)

In April, 1991, Cragin Financial Corporation ("Cragin Corp."), the holding company for Cragin Federal Bank for Savings ("Cragin Bank"), announced that Cragin Bank would convert from mutual to stock ownership[2] and would offer 10,500,000 shares of

---

1. Throughout this Memorandum Opinion the term "Complaint" refers to the Commission's Amended Complaint for Permanent Injunction and Other Relief.

2. Savings associations can be either mutual or stock institutions. In accordance with federal law, mutual institutions may convert to stock institutions by issuing and selling shares of "conversion stock." Any such conversion is regulated

common stock ("Cragin stock") for sale at approximately $10 per share. Eligible Cragin Bank accountholders received non-transferable Conversion Subscription Rights ("conversion rights"), giving them a preferential opportunity to purchase Cragin stock before it went on sale to the general public. Accountholders who wished to purchase stock had to exercise their conversion rights no later than May 25, 1991. (Complaint ¶ 10.)

Approximately five days before the Cragin subscription offering closed, Hart and Jakubowski formed a plan to buy Cragin stock using the conversion rights given to valid Cragin accountholders. Jakubowski, Hart, and GCA were not eligible Cragin accountholders at the time of the subscription offering, and were therefore not personally eligible for conversion rights. (Complaint ¶ 11.)

Jakubowski located a secretary in the law firm where he worked who was an eligible Cragin accountholder. He explained to the secretary that he wanted to use her conversion rights to buy Cragin stock on behalf of an unnamed individual. He further explained that she would incur no risk in the transaction, and would receive a percentage of any profit made on the sale of the stock. (Complaint ¶ 13.) The secretary agreed to participate, and shortly thereafter Jakubowski filled out a Stock Order Form for 35,000 shares of Cragin stock. (Complaint ¶ 14.) This stock order form contained language directly above the signature line that stated: "All rights exercisable hereunder are not transferable and shares purchased upon exercise of such right must be purchased for the account of the person exercising such rights." Although the stock order form listed the secretary as the actual purchaser of the stock, Jakubowski indicated that the stock was to be sent directly to him at the law firm. The secretary signed the form, and Jakubowski took the form to Cragin on May 25, 1991. (Complaint ¶ 14.) At no time before the conversion did Cragin learn that Jakubowski, Hart and GCA were using the valid accountholder's Conversion Subscrip-

tion Rights so that Hart and GCA could buy the stock themselves. (Complaint ¶ 18.)

Jakubowski further instructed the secretary to turn control of the Cragin Stock over to GCA and Hart by signing a blank stock power form. He sent a copy of the form to Hart who then wired $350,000 to Cragin to pay for the stock ordered in the secretary's name. (Complaint ¶ 15.) Jakubowski prepared an agreement between Hart and the secretary formalizing their understanding that the secretary would receive a fixed percentage of any profits made on the sale of the Cragin stock. (Complaint ¶ 16.)

Cragin made the conversion from mutual to stock ownership on June 6, 1991. (Complaint ¶ 17.) Cragin Stock was oversubscribed, and therefore some accountholders were not able to buy any Cragin Stock and others could only buy a portion of what they had requested. However, GCA and Hart did buy the entire 35,000 shares they had ordered at $10 per share. In contrast, the members of the general public who did not have conversion rights were not able to purchase any shares in the initial offering, and instead had to buy the stock when it opened for public trading at $13.50 per share. (Complaint ¶ 17.) When Jakubowski received the stock certificate from Cragin, he forwarded it to Hart, who sold the stock for a profit. Pursuant to their earlier agreement, Hart gave Jakubowski approximately $10,000 for his participation in the plan. (Complaint ¶ 20.)

Several months later, Calumet Federal Savings and Loan Association of Chicago ("Calumet") announced that it would be converting to a stock form of ownership, and in conjunction with this conversion would be offering 2,050,000 shares of stock ("Calumet stock") to eligible accountholders at approximately $15 per share. Eligible accountholders had until February 6, 1992 to exercise their Conversion Subscription Rights. (Complaint ¶ 19.) While neither Jakubowski, nor Hart, nor GCA was a Calumet account-

---

by the Office of Thrift Supervision ("OTS"). OTS Regulation 12 CFR § 563b.3(c) requires that a converting savings institution give eligible accountholders subscription rights, which allow them to purchase certain amounts of the institution's conversion stock before the general public may do so.

**1078**

holder, Jakubowski was able to find the father of a secretary at his firm who was an eligible accountholder. (Complaint ¶¶ 20, 21.)

Jakubowski had the accountholder sign a stock order form which Jakubowski then completed and submitted to Calumet's holding company. (Complaint ¶ 21.) This stock order form contained language specifying that:

> All rights exercisable hereunder are not transferable and shares purchased upon exercise of such rights must be purchased for the account of the person exercising such rights. The undersigned certifies that the Stock Order is for my account only and there is no agreement or understanding regarding the transfer of my subscription rights or any further sale or transfer of these shares.

(Complaint ¶ 21.) Jakubowski again prepared a written agreement between Hart and GCA and the secretary's father promising that the father would get a certain percentage of any profits on the sale of the Calumet stock. (Complaint ¶ 22.) Calumet did not become aware that GCA and Hart were the true purchasers of the stock until after the conversion. (Complaint ¶ 24.)

The Calumet Stock was oversubscribed, and consequently, some accountholders did not get a chance to purchase the stock they had ordered, and no non-accountholders were legally able to buy any stock until after trading began. (Complaint ¶ 23.) GCA and Hart, by using the secretary's father's conversion rights did receive all of its requested shares at $15 per share. (Complaint ¶ 23.) GCA and Hart later sold those shares at a profit and provided Jakubowski with a $5,000 share. (Complaint ¶ 24.)

In addition to the preceding transactions, Jakubowski, Hart and GCA participated in similar plans when AmeriFed Financial Corporation ("AmeriFed") and Plains Spirit Financial Corporation ("Plains Spirit") converted to stock ownership. (Complaint ¶ 25.) In the case of the AmeriFed transaction, Jakubowski personally borrowed money from Hart so that he could purchase stock for himself by using a valid accountholder's Conversion Subscription Rights. (Complaint ¶ 25.) As in the Cragin and Calumet transactions, Jakubowski completed stock order forms signed by the eligible accountholders so that he, Hart or GCA could purchase conversion stock. (Complaint ¶ 26.) Both the AmeriFed and the Plains Spirit offerings were also oversubscribed, resulting in a shortage of stock for the accountholders.

In total, Jakubowski used accountholder's Conversion Subscription Rights to purchase approximately 172,050 shares of Conversion Stock for himself, Hart and GCA for a total price of nearly $2 million. (Complaint ¶ 27.) Jakubowski himself made at least $49,500 as the result of his participation in the plans. (Complaint ¶ 28.)

### Analysis

Jakubowski moves the court to dismiss the complaint against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The court will dismiss a complaint for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chaney v. Suburban Bus Div.*, 52 F.3d 623, 627 (7th Cir.1995) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In deciding whether the complaint states a claim, the court "accept[s] as true the factual allegations of the complaint and draw[s] all reasonable inferences in favor of the plaintiff[ ]." *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1343 (7th Cir.1995) (citing *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990)).

In its Amended Complaint the Securities and Exchange Commission ("the Commission") alleges that Jakubowski violated Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 USC § 78j, as well as Rule 10b–5 promulgated thereunder, 17 CFR § 240.10b–5. The fundamental purpose of the 1934 Act "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Basic Inc. v. Levinson*, 485 U.S. 224, 234, 108

S.Ct. 978, 985, 99 L.Ed.2d 194 (1988) (citations omitted). Consistent with this purpose, Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, entitled "Employment of manipulative and deceptive devices," states:

> It shall be unlawful for any person, directly or indirectly ...
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

In action brought by the Commission pursuant to Section 10(b) and Rule 10b–5, the Commission must prove by a preponderance of the evidence all five of the following elements:

(1) The defendant, directly or indirectly, made an untrue statement of fact or (alternatively) omitted to state a material fact where he had a duty to speak; and

(2) The statement or omission was material; and

(3) The statement or omission was made "in connection with" the purchase or sale of a security; and

(4) The defendant made the statement or omission knowingly or recklessly; and

(5) The transaction involved interstate commerce, or the mails, or a national securities exchange.

Section 10(b); Rule 10b–5; *SEC v. First Jersey Sec., Inc.*, 890 F.Supp. 1185, 1209 (S.D.N.Y.1995); *SEC v. Hasho*, 784 F.Supp. 1059, 1106 (S.D.N.Y.1992); *SEC v. Kluesner*, 834 F.2d 1438, 1439 (8th Cir.1987).[3]

■ Drawing all reasonable inferences in favor of the Commission, the court finds that the factual allegations in the complaint support all five elements of a Section 10(b) claim. Therefore, the complaint states a claim upon which relief can be granted and survives Jakubowski's motion to dismiss.

## I. UNTRUE STATEMENT OR OMISSION

The Commission must prove that Jakubowski directly or indirectly made an untrue statement of fact or (alternatively) omitted to state a fact where he had a duty to speak. The complaint establishes that Jakubowski made an untrue statement of fact with respect to the sale of stock by Cragin Corp.[4]

---

**3.** The court notes in passing that these elements are derived largely from subpart (b) of Rule 10b–5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact." Most cases concerning Rule 10b–5 focus on subpart (b) and largely ignore subpart (a), which makes it unlawful "[t]o employ any device, scheme, or artifice to defraud," and subpart (c), which makes it unlawful to do anything that "would operate as a fraud or deceit upon any person." The briefs submitted in this case also focus on subpart (b) rather than subparts (a) and (c). Given the focus of the caselaw and the briefs, the court structures this Memorandum Opinion around the five elements listed above, derived largely from subpart (b).

Notwithstanding the relatively vague language of subparts (a) and (c), the courts, the Commission, and private parties might look more closely at subparts (a) and (c) in future cases, especially those involving "novel" forms of fraud. *Cf. In re Towers Financial Corporation Noteholders Litigation,* 1995 WL 571888 at *15–16 (S.D.N.Y.1995) ("Plaintiffs must prove all the established elements of a Rule 10b–5 claim even when proceeding under Rule 10b–5(a) & (c).").

**4.** The court focuses its analysis on Jakubowski's activities related to Cragin Bank's conversion from mutual to stock ownership. Because the court finds that the allegations in the complaint

Jakubowski personally filled out a Stock Order Form provided by Cragin Corp. On the form Jakubowski specifically indicated that the purchaser of 35,000 shares of Cragin stock was Diane Wrobel, a secretary at Jakubowski's law firm and an account holder at Cragin Bank. This was an untrue statement of fact because the purchaser was not the secretary; the purchaser was GCA or Hart, who was not an account holder at Cragin. After filling out the Stock Order Form, Jakubowski directed the secretary to sign it and then delivered the form to Cragin Corp.

■ Jakubowski contends that the factual allegations in the complaint do not establish that he made an untrue statement of fact or omitted to state a fact within the meaning of Rule 10b–5. He offers several arguments in support of this contention, none of them persuasive.[5] First, Jakubowski argues that he is not liable because he "made no representations of fact to anyone, much less misrepresentations of fact." (Def.'s Mem. in Supp. at 21, 18.) As noted above, however, Jakubowski represented that the purchaser of the Cragin stock was a secretary at his firm, when in fact the purchaser was Hart or GCA.

■ Second, Jakubowski argues that he is not liable because he personally "had no contact with the issuing thrifts." (Def.'s Mem. in Supp. at 18, 21, 27.) As noted above, however, Jakubowski not only filled out the form and directed the secretary to sign it; he also personally delivered the form to Cragin

Corp. In this sense, Jakubowski clearly had contact with the issuing thrifts. Even if Jakubowski had not had direct contact with the issuing thrifts, his argument would fail because it rests on the mistaken theory that a party who has no contact with the "other side" cannot be liable for a violation of Section 10(b) and Rule 10b–5. This theory is inconsistent with the express language of Rule 10b–5, which imposes liability on any person who directly *or indirectly* makes any untrue statement of material fact. This theory is also inconsistent with *SEC v. Holschuh*, 694 F.2d 130 (7th Cir.1982), which expressly rejects the theory that "actual or first-hand contact with offerees or buyers [is] a condition precedent to primary liability" for violations of Section 10(b). *Id.* at 142, *see also id.* at 140 (reaching same conclusion for violations of related securities laws).

Jakubowski's efforts to distinguish his case from *Holschuh* (Def.'s Mem. in Supp. at 22–24) are unpersuasive. Like Holschuh, Jakubowski "was a substantial and necessary participant" in the relevant transactions. *Holschuh*, 694 F.2d at 140. Jakubowski sought out the secretary, persuaded her to allow her conversion rights to be used, filled out the Stock Order Form, directed the secretary to sign it, and delivered the form to Cragin. Like Holschuh, Jakubowski was "responsible" for the relevant misstatement, and, conversely, the relevant misstatement was "traceable" to Jakubowski. *Id.* at 142.

---

regarding these activities establish a violation of Section 10(b) and Rule 10b–5, it is unnecessary for the court to consider at this stage whether Jakubowski's other activities (related to Calumet Federal Savings and Loan, AmeriFed Financial Corporation, and Plains Spirit Financial Corporation) also constitute a violation of Rule 10(b). This approach is consistent with the parties' briefs and the complaint itself, which focus primarily on the Cragin Bank conversion. For the record, the court notes one potentially significant difference between the Cragin Bank conversion and the AmeriFed conversion: The complaint alleges that Jakubowski "borrowed money from Hart to purchase at least $48,000 of Conversion Stock in AmeriFed using an accountholders' Conversion Subscription Rights." (Amended Complaint ¶ 24.)

5. Jakubowski argues—and the court agrees—that the complaint does not allege that he employed a "manipulative device" within the narrow mean-

ing of Section 10(b). As the Supreme Court has explained,

"Manipulation" is "virtually a term of art when used in connection with securities markets." The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383–84, 47 L.Ed.2d 668 (1976) (further citations omitted)). The complaint does not appear to allege that Jakubowski engaged in any of these "manipulative devices." As set forth below, however, the complaint does allege that Jakubowski used a "deceptive device or contrivance" under Section 10(b) and Rule 10b–5 in that he made a material misstatement in connection with the purchase or sale of a security.

■ Third, Jakubowski argues that he is not liable because he did not sign the Stock Order Form. (Def.'s Mem. in Supp. at 21–22, 27.) According to the complaint, however, Jakubowski filled out the form, provided his own name and address in the address box, directed the secretary to sign the form, and delivered the form to Cragin. These actions clearly support a finding that Jakubowski made an untrue statement of fact under Rule 10b–5, which must be read "flexibly, not technically and restrictively." *In re Leslie Fay Companies*, 871 F.Supp. 686, 696 (S.D.N.Y.1995) (quoting *Superintendent of Ins. v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971)). Jakubowski cites no authority for the proposition that Rule 10b–5 extends to the person who signs a document containing an untrue statement of material fact but not to the person who prepares the document, counsels another to sign the document, and delivers the document. The Seventh Circuit apparently reached the opposite conclusion when it noted that a defendant cannot escape liability for securities fraud "by participating in all except the final steps" of a transaction. *Holschuh*, 694 F.2d at 140.

■ Fourth, Jakubowski argues that he is not liable because he owed "no duty of disclosure" to the issuing thrifts. (Def.'s Mem. in Supp. at 18, 21, 28.) Rule 10b–5 makes it unlawful for any person to make a misrepresentation of material fact or *alternatively* to make an omission of material fact where there is a duty to speak. Rule 10b–5; *SEC v. First Jersey Sec., Inc.*, 890 F.Supp. 1185, 1209 (S.D.N.Y.1995). The duty to speak arises only where the plaintiff alleges an omission of material fact, not where the plaintiff alleges an affirmative misstatement of material fact. *Id.; see Schatz v. Rosenberg*, 943 F.2d 485, 490 (4th Cir.1991) (citing *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir.1986) (noting that duty to speak required where claim alleges failure to speak, not where claim alleges affirmative misstatement), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992)). As explained above, the complaint alleges that Jakubowski made an affirmative misstatement of fact. This makes it unnecessary for the court to consider the alternative possibility that Jakubowski also made an omission of material fact where he had a duty to speak.[6] For present purposes, therefore, it is irrelevant whether Jakubowski had a duty to speak.

Fifth, Jakubowski argues that he is not liable because a professional is not responsible for the misrepresentations of another, even when he is aware of those misrepresentations. (Def.'s Mem. in Supp. at 25–28; Def.'s Reply at 6–7.) This argument is fundamentally flawed because this case involves a misrepresentation by Jakubowski, not a misrepresentation by "another." In light of this fact, the cases cited by Jakubowski[7] are irrelevant because they do not involve professional persons who make affirmative misrepresentations. Rather, they involve professionals who fail to "blow the whistle" on clients who make affirmative misrepresentations. *See Schatz*, 943 F.2d at 491 (noting difference between professionals who make "affirmative misrepresentations" and professionals who simply "fail to tattle on their client[s]").

6. Were the court to consider this issue, the court would be inclined to agree with Jakubowski that he had no generalized preexisting duty to disclose information to Cragin Corp. However, by filling out and delivering the Stock Order form, Jakubowski arguably gave rise to a duty to disclose. As the Sixth Circuit recently explained, A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant [in a violation of Section 10(b) and Rule 10b–5]. Conversely, a person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession.

*Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 917 (6th Cir.1991) (citing *SEC v. Washington County Util. Dist.*, 676 F.2d 218, 223 (6th Cir.1982)); *see Schatz*, 943 F.2d at 491 (noting that attorneys may be liable for failure to disclose when they issue misleading legal opinions but not when they merely fail to "blow the whistle" on their clients).

7. *Renovitch v. Kaufman*, 905 F.2d 1040 (7th Cir. 1990); *Barker; Schatz; Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir.1988), *vacated on other grounds*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1988).

■ Sixth, Jakubowski argues that he is not liable because he was "little more than a finder," citing *SEC v. Great American Industries, Inc.*, 407 F.2d 453, 460–61 (2d Cir. 1968), *cert. denied*, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969). (Def.'s Mem. in Supp. at 22.) In *Great American*, Judge Friendly observed that imposing a duty to disclose on a finder in a real estate transaction "would require most careful consideration." *Great American*, 407 F.2d at 460–61. This observation has little relevance to the instant case. In the first place, Judge Friendly expressly declined to answer the question he raised. *See id.* at 461 (finding "no need" to address the question). In the second place, even if a finder in a real estate transaction had no duty to disclose, that would preclude liability for omissions of fact but not for affirmative misstatements of fact. In the third place, Jakubowski was not a finder in a real estate transaction. He clearly did more than "find" the secretary: He filled out the Stock Order Form (making an untrue statement of fact), directed the secretary to sign the form, and delivered the form to Cragin.

■ Seventh, Jakubowski argues that he is not liable because he did not "control" the secretary who signed the form. (Def.'s Mem. in Supp. at 24–25.) This argument is both unpersuasive and irrelevant. The argument is unpersuasive because Jakubowski did in fact "control" the secretary to the extent necessary to make him responsible for her signature on the form. Jakubowski sought out the secretary, persuaded her to let her conversion rights be used, filled out the form, directed the secretary to sign the form, and delivered the form to Cragin. To the extent that the secretary's signature amounts to a misstatement of fact within the meaning of Rule 10b–5, Jakubowski was responsible for that misstatement. In this sense, the factual allegations in the complaint would allege that Jakubowski made an untrue statement of fact not only directly (when he filled out and delivered the form) but also indirectly (when he directed the secretary to sign it). In any event, the argument is irrelevant because Jakubowski himself made an untrue statement of fact when he filled out and delivered the Stock Order Form. Whether the secretary also made a misstatement when she signed the form under the acknowledgment, and whether Jakubowski "controlled" her when she made the misstatement, is irrelevant.

Jakubowski cites *Barker* for the proposition that a professional cannot "control" a third party (Def.'s Mem. in Supp. at 24–25), but *Barker* has no direct bearing on this case. The short passage of *Barker* cited by Jakubowski, 797 F.2d at 494, does not address liability under Section 10(b) of the Securities Act of 1934. Instead, it addresses liability under Section 15 of the Securities Act of 1933, which specifically imposes liability on anyone who "controls any person liable under sections 11 or 12" of that act. *Id.* Neither Barker nor any other case cited by Jakubowski "imports" this specific analysis from Section 15 of the Securities Act of 1933 to Section 10(b) of the Securities Act of 1934. The subsequent passages of *Barker* that do address Section 10(b) merely hold that failure to blow the whistle does not create liability unless the defendant has a duty to blow the whistle. *See id.* at 495–96. As noted above, this holding is relevant to cases that allege omissions of material fact but not to cases that—like the case at bar—allege an affirmative misstatement of material fact.

## II. MATERIALITY

■ The Commission must prove that Jakubowski's misstatement was "material." It is well-established that "[a]n omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Branch–Hess Vending Services Employees' Pension Trust v. Guebert*, 751 F.Supp 1333, 1340 (C.D.Ill.1990) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)). "Materiality has an element of causation built in, because a statement is material only if it so alters the 'total mix' of information available to the investor that it has the potential to affect the [investment] decision." *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.) (citing *TSC Indus., Inc. v. Northway, Inc.*,

426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). The purpose of the materiality element is "to filter out essentially useless information that a reasonable investor would not .consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic,* 485 U.S. at 234, 108 S.Ct. at 985 (citing *TSC,* 426 U.S. at 448–49, 96 S.Ct. at 2131–32).

In this context the term "investment decision" necessarily encompasses decisions to sell as well as decisions to purchase securities. A narrower definition of "investment decision"—limited to the purchase of securities—might better comport with traditional notions of "investment." *E.g., Black's Law Dictionary* 741 (5th ed. 1979) (defining "investment" as "[a]n expenditure to acquire property or other assets in order to produce revenue"); *id.* at 518 (defining "expenditure" as "spending or payment of money"). However, such a narrow definition would contradict both the language of Section 10(b), which proscribes fraud "in the purchase *or sale* of any security" (emphasis added), and the underlying purpose of the section, which aimed to "cover frauds practiced on the seller as well as on the buyer," *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 941–42 (2d Cir.) (Friendly, J.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Such a narrow definition would also overturn numerous cases applying Section 10(b) to frauds on sellers. *E.g., Superintendent of Ins. v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Since the definition of "investment decision" includes the decision to sell, there can be no doubt that "[a] statement or an omission is material if it reasonably could have been expected to influence the decision to sell." *Nelson v. Serwold,* 576 F.2d 1332, 1335 (9th Cir.) (citing *Affiliated Ute Citizens,* 406 U.S. at 153, 92 S.Ct. at

1472), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

In this case, Jakubowski stated (falsely) on the Stock Order Form that the purchaser of the Cragin stock was the secretary (rather than Hart or GCA). This misstatement was material because it affected Cragin's investment decision. Specifically, it caused Cragin to sell 35,000 shares of stock to Hart or GCA rather than selling those shares to qualified holders of conversion rights. If Jakubowski had stated the truth on the Stock Order Form, then Cragin would not have sold the stocks to Hart or GCA because a regulation promulgated by the Office of Thrift Supervision ("OTS") prohibited the transfer of the secretary's conversion rights to Hart or GCA.

Jakubowski argues that the OTS regulation did not actually prohibit his conduct.[8] OTS Regulation 12 CFR § 563b.3(i)(1), entitled "Prohibited transfers," states that "no person shall transfer, or enter into any agreement or understanding to transfer, the legal or beneficial ownership of conversion subscription rights, or the underlying securities to the account of another." Conceding that the regulation seems "broad in scope," Jakubowski nonetheless claims that "a review of the history and purpose behind this regulation reveals that it was never intended to prohibit simple depositors (and their sources of capital) from participating in the short-term price increase that typically follows thrift conversions." (Def.'s Mem. in Supp. at 29.) This argument has little merit. The history and purpose of the regulation cannot alter its plain meaning. *See, e.g., In re Sinclair,* 870 F.2d 1340, 1341 (7th Cir.1989) (holding that where legislative history contradicts words of statute, "the statute must prevail"). Given the plain meaning of the OTS regulation, the complaint clearly alleges that Jakubowski's conduct violated the regulation. It is fair to assume that if Cragin had been aware of the violation it would have refused to sell the stocks to Hart or GCA. Therefore, Jaku-

8. Strangely, Jakubowski situates this argument at the end of his brief (Def.'s Mem. in Supp. at 28–30) rather than in his earlier discussion of materiality (Def.'s Mem. in Supp. at 19–21). For reasons set forth later in this Memorandum Opinion, however, the OTS regulation has little relevance to any aspect of this case other than materiality.

bowski's misrepresentation affected Cragin Corp.'s decision to sell Cragin stocks to CGA and Hart, making the misrepresentation "material" for purposes of Rule 10b-5.

■ Jakubowski argues that his statement on the Stock Order Form was not "material" because Cragin's decision to sell stocks to Hart and GCA was not an "investment decision." (Def.'s Mem. in Supp. at 19–21.) Specifically, Jakubowski argues that his statement on the Stock Order Form had no effect on Cragin's decisions about whether to sell stock, how much stock to sell, and what price to charge for the stock; Jakubowski's statement affected only the identity of the purchaser of 35,000 of those shares.

Whether a statement that affects only the identity of the purchaser of stock is "material" under Rule 10b-5 appears to be a question of first impression. The court concludes that such a statement is indeed material. In *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court explained that the role of the materiality requirement is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Id.* at 234, 108 S.Ct. at 985. This leads the court to ask whether the identity of the buyer of Cragin stock was "essentially useless information that [Cragin Corp.] would not consider significant," or, conversely, whether it was useful information that Cragin would consider significant. The court finds that Cragin Corp. would consider the identity of the buyer "significant" for at least two reasons. First, Cragin Corp. had an interest in abiding by OTS regulations and seeing to it that others abided by those regulations. Second, Cragin Corp. had in interest in ensuring that as many eligible accountholders as possible had the opportunity to purchase Cragin stocks. According to the Complaint,

> Cragin Stock was oversubscribed by persons holding Conversion Subscription Rights. As a result, certain Cragin accountholders who attempted to exercise Conversion Subscription Rights were unable to purchase Cragin Stock at all or were only allowed to purchase a portion of what they had originally requested. GCA and Hart, however, were able to purchase the entire amount they requested at $10.00 per share. In addition, no Cragin Stock was made available to the general public in the initial offering and when it was subsequently available for public trading it opened at a price of $13.50 per share, substantially above the price paid by GCA and Hart.

(Complaint ¶ 17.) Because the Conversion Stock offerings were oversubscribed, the misstatement by Jakubowski and the subsequent purchase of Cragin Stock by Hart and GCA deprived eligible accountholders of the opportunity to buy $350,000 worth of Conversion Stock. The court finds that Cragin Corp. (like any reasonable savings association) would consider this harm to its accountholders "significant." That makes Jakubowski's misstatement "material."

In reaching the opposite conclusion, Jakubowski cites *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). In that case the buyer of department store company sued the seller and the seller's accounting firm, alleging that they overvalued the company's inventory. Although the seller valued the inventory before and on the closing date, the seller's accounting firm did not value the inventory until weeks after the closing date. *Id.* at 929–30. The Seventh Circuit held, per Judge Easterbrook, that the accounting firm's valuation was not "material" because it occurred after the closing date and therefore could not have affected the buyer's "investment decision." *Id.* at 931–32. In explaining this holding, Judge Easterbrook observed that:

> Materiality has an element of causation built in, because a statement is material only if it so alters the "total" mix of information available to the investor that it has the potential to affect the decision. But materiality usually refers to the importance of the information; a datum that would have only a small effect on the price is not material, while a datum with the potential for a larger effect is. The valuation of the inventory [in this case] would be

material in this usual sense, except for the fact that [the accounting firm] did not communicate with [the buyer] until after the closing. By then it was too late. The information, even if conventionally "material," did not affect the investment decision. *Id.* at 931 (citation omitted).

The holding in *LHLC* in no way weakens the court's conclusion that Jakubowski's statement was "material." It is true that Jakubowski's misstatement occurred after Cragin Corp. decided to offer its accountholders a certain number of shares at a certain price. However, Jakubowski's misstatement occurred before Cragin Corp. decided to whom they would sell their stock, and Jakubowski's misstatement directly affected that decision.

■ Jakubowski argues that his misstatement cannot be material because it did not affect the price of the stock sold by Cragin Corp. Jakubowski seizes on Judge Easterbrook's comment in *LHLC* (quoted above) that "materiality usually refers to the importance of the information; a datum that would have only a small effect on the price is not material, while a datum with the potential for a larger effect is." *Id.* Even if it were not dicta, this comment would not alter the result in the case at bar. Judge Easterbrook merely offered price as a leading example of potentially material information. In the very next sentence, however, he indicated that price is not the only determinant of materiality: Timing can be important too. *See id.* Thus, far from suggesting that price is the only determinant of materiality, Judge Easterbrook's comment indicates that price is not the only determinant of materiality.

This result is hardly surprising. In cautioning courts against "confining materiality to a rigid formula," the Supreme Court stated that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be over-inclusive or underinclusive." *Basic Inc. v. Levinson,* 485 U.S. 224, 236, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988). Rather than focus on a single factor such as price, the Supreme Court has advised "that materiality is something to be determined on the basis of

the particular facts of each case." *Id.* at 238, 108 S.Ct. at 987 (citing *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976) (Friendly, J.)). Based on the facts of this case, the court finds that Jakubowski's misstatement was material.

## III. "IN CONNECTION WITH"

■ Section 10(b) makes it unlawful to use a deceptive device "in connection with" the purchase or sale of a security, and Rule 10b–5 makes it unlawful to make a misstatement of material fact "in connection with" the purchase or sale of a security. In *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), a unanimous Supreme Court indicated that a deception occurs "in connection with" the sale of a security when it "touches" the sale. *Id.* at 12–13, 92 S.Ct. at 168–69. Emphasizing that "Section 10(b) must be read flexibly, not technically and restrictively," *id.* at 12, 92 S.Ct. at 169, the court quoted with approval the case of *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2nd Cir.1967), in which the Second Circuit stated:

> We believe that [Section] 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

*Superintendent,* 404 U.S. at 10–11 n. 7, 92 S.Ct. at 168 n. 7 (quoting *A.T. Brod,* 375 F.2d at 397) (emphasis in original). Drawing on the legislative history of Section 10(b), the Supreme Court continued: "Since practices 'constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers' in the regulatory agency 'have been found practically essential.'" *Superintendent,* 404 U.S. at 12, 92 S.Ct. at 169 (quoting legislative history). Thus, while the meaning of "in connection with" has varied somewhat in actions brought by private plaintiffs, the meaning of the phrase in actions brought by the Commission "remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting in-

vestors." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir.1993). In actions brought by the Commission, "[f]raud touching the intrinsic value of securities *and the means of accomplishing the purchase of securities* is sufficiently connected with securities transactions to bring the fraud within section 10(b)." *Id.* (citations omitted) (emphasis added).

■■ Jakubowski made a material misstatement "in connection with" the purchase or sale of a security when he falsely claimed that the purchaser of the Cragin stock was the secretary. His fraudulent claim not only "touched" the sale of securities, *Superintendent,* 404 U.S. at 12–13, 92 S.Ct. at 168–69; it was the very "means of accomplishing the purchase of securities," *Rana,* 8 F.3d at 1362. As such, Jakubowski's claim occurred "in connection with" the purchase or sale of a security and fell within the range of activities subject to enforcement actions by the Commission. *Id.* That Jakubowski's fraud was atypical "should not provide immunity from the securities laws." *Superintendent,* 404 U.S. at 10–11 n. 7, 92 S.Ct. at 168 n. 7 (quoting *A.T. Brod,* 375 F.2d at 397).

Jakubowski argues that his alleged statement did not occur "in connection with" the purchase or sale of a security. In support of his argument he cites *Gurwara v. LyphoMed, Inc.,* 937 F.2d 380 (7th Cir.1991), an action by a private plaintiff against his former employer. In that case the employer promised Gurwara that a change from full-time employment to short-term disability status would not affect valuable stock option rights that Gurwara obtained previously. When Gurwara later sought to exercise his stock option rights, his employer refused to honor the promise, stating that Gurwara's change of status had terminated the rights. *Id.* at 381. Gurwara sued his former employer, asserting a federal claim under Section

10(b) and state claims for breach of contract and fraud.

The Seventh Circuit affirmed the dismissal of Gurwara's federal securities claim. Stressing that Gurwara's complaint "appear[ed] to state a good cause of action under state law," the court concluded that Gurwara failed to state a claim under Section 10(b) because the alleged misrepresentations "did not go to the value of the stock at issue or the value of the consideration in return for it." *Id.* at 383. Focusing on this language, Jakubowski argues that he made no statement "in connection with" the purchase or sale of a security because his statement did not concern the value of the Cragin stock or the value of the consideration that GCA and Hart paid for it. Although certain pronouncements in *Gurwara* lend superficial support to this argument, a careful analysis of the facts and controlling caselaw leads the court to a different conclusion.

In *Gurwara* the fraud did not "touch" the sale of a security because there was no sale of a security. Instead, there was a broken promise not to cancel an option to purchase securities.[9] After Gurwara's employer broke its promise and cancelled the option, the Seventh Circuit held that the appropriate remedy was a state action for breach of contract and common law fraud, not a federal action for securities fraud. In the case at bar, by contrast, there was a securities transaction and nothing but a securities transaction. Cragin Corp. sold $350,000 worth of Cragin stock to GCA and Hart, relying on Jakubowski's fraudulent claim that the purchaser of the stock was a qualified Cragin accountholder. Jakubowski's fraudulent claim was the means of accomplishing an actual purchase of securities, bringing it the scope of an enforcement action brought by the Commission pursuant to Section 10(b).[10]

---

9. The Seventh Circuit was careful to note that the parties in *Gurwara* treated the promised stock—not the stock option contract—as the relevant "security." The court expressly declined to address the question "[w]hether Gurwara might have sued successfully under section 10(b) for misrepresentations in connection with this *option contract.*" *Id.* at 382 n. 2 (emphasis in original).

10. Like *Gurwara,* the other cases cited by Jakubowski are distinguishable from the case at bar. Three of the cases cited involved misrepresentations in non-securities transactions in which securities were incidentally involved. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (corporation misstated its financial condition to secure bank loan; bank loan was secured in part by pledge of stock

It is true, as Jakubowski points out, that the Seventh Circuit dismissed Gurwara's claim on the ground that his employer's misrepresentation "did not go to the value of the stock at issue or the value of the consideration in return for it." *Gurwara v. LyphoMed, Inc.*, 937 F.2d at 383. To the extent that this pronouncement states a rule of law, however, an analysis of other relevant cases suggests that such a rule must be limited to cases like *Gurwara*, where the misstatement at issue has little or no relationship to an actual securities transaction. In *Superintendent*, the Supreme Court specifically rejected the proposition that there can be no violation of Rule 10(b) where there is "no fraud is alleged as to the investment value of the securities.." 404 U.S. at 10–11 n. 7, 92 S.Ct. at 168 n. 7. (discussing *A.T. Brod*, 375 F.2d at 396). In *Costello v. Oppenheimer & Co.*, 711 F.2d 1361 (7th Cir.1983), the Seventh Circuit held that the practice known as "churning"— "a course of excessive trading through which a broker advances his own interests (e.g., commissions based on volume) over those of his customer"—violates Section 10(b) and Rule 10b–5 as a matter of law. Yet "churning" involves neither the value of a security nor the value of the consideration given in return for a security. In *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the Second Circuit held that a brokerage firm trainee who falsely represented that he was an experienced stockbroker violated Section 10(b) and Rule 10b–5, even though the trainee never misrepresented the value of a security. In reaching that conclusion, the Second Circuit expressly rejected a rule that would limit recovery under Section 10(b) to fraudulent misrepresentations about the value of a security because "[s]o concise a theory of liability for fraud would be too accommodative of many common types of fraud, *such as the misrepresentation of a collateral fact that induces a transaction.*" *Id.* at 710 n. 3 (emphasis added).[11]

In sum, the court finds that Jakubowski made a material misstatement "in connection with" the purchase or sale of a security because his misstatement "touched" an actual sale of securities in that it was the "means of accomplishing the purchase of securities."[12]

## IV. SCIENTER AND JURISDICTIONAL MEANS

The Commission must prove that Jakubowski made the relevant statements knowingly or recklessly, and that jurisdictional means were used (*e.g.*, interstate commerce, the mail, or a national securities exchange). The court finds—and Jakubowski does not appear to dispute—that the factual allegations in the complaint support both of these elements.

Because the factual allegations in the complaint support all of the elements of a Section 10(b) action brought by the Commission, the court concludes that the Commission has stated a claim upon which relief can be granted.

## V. OTHER ISSUES

Jakubowski makes several arguments relating to the OTS regulation, but none of them justifies dismissal of the complaint against him. First, Jakubowski argues that he did not violate the OTS regulation. (Def.'s Mem. in Supp. at 28–29.) The court considered and rejected this argument above in connection with the "materiality" element.

in corporation's subsidiary), *Hunt v. Robinson*, 852 F.2d 786 (4th Cir.1988) (employer refused to honor earlier promise to tender securities to employee as part of employment contract), and *Citibank, N.A. v. K–H Corp.*, 745 F.Supp. 899 (S.D.N.Y.1990) (in commercial lending transaction, sole shareholder of corporation misrepresented ability to make cash equity contribution to corporation). In *In re Financial Corp. of Am. Shareholder Lit.*, 796 F.2d 1126 (9th Cir.1986), the relationship between the misrepresentation and the securities was even more tangential. *See id.* at 1129 (likening case to *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928)).

11. *See also Board of Trustees of Fire Fighters Pension Fund v. Poder*, 712 F.Supp 135 (N.D.Ill1989) (unauthorized trading violates Rule 10b–5).

12. In light of this finding, the court declines to consider the SEC's further argument that Jakubowski's misstatement related to the consideration for the conversion stock.

Second, according to Jakubowski, the mere fact that Jakubowski may have violated the OTS regulation does not mean that he also violated Section 10(b). (Def.'s Mem. in Supp. at 11–13.) The court agrees. However, the allegations in the complaint show not only that Jakubowski violated the OTS regulation; they show that Jakubowski made a material misstatement in connection with the purchase or sale of a security, establishing every element of a Section 10(b) violation. As noted above, the only direct relevance of the OTS regulation to the five elements of a Section 10(b) action brought by the Commission is that the OTS regulation made Jakubowski's misstatement material. Jakubowski cites *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), which held that "a breach of fiduciary duty by majority stockholders, *without any deception, misrepresentation, or nondisclosure*" does not violate Section 10(b). *Id.* at 476, 97 S.Ct. at 1302 (emphasis added). But *Santa Fe* has no bearing on this case, because the allegations in the complaint demonstrate a material misrepresentation, not just a violation of the OTS regulation. Contrary to Jakubowski's claim, the complaint does not "bootstrap" a Section 10(b) violation onto an OTS violation.

Third, according to Jakubowski, the structure of the OTS regulations means that he did not violate Section 10(b). (Def.'s Mem. in Supp. at 14–16.) This argument, though highly creative, is wholly unpersuasive. The provision Jakubowski cites applies only to persons associated with savings associations; since Jakubowski was not associated with a savings association, the provision is irrelevant to this case. At an even more fundamental level, nothing in the OTS regulations can alter the meaning of Section 10(b) and Rule 10b–5.

Jakubowski also argues that he cannot be liable for a violation of Section 10(b) in light of the Supreme Court's recent decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,* N.A., — U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). (Def.'s Mem. in Supp. at 30.) In that case the Supreme Court held that there is no liability for "aiding and abetting" under Sec-

tion 10(b). As explained above, however, the allegations in the complaint show that Jakubowski himself violated Section 10(b). The complaint does not and could not premise liability on a theory of "aiding and abetting."

### *Conclusion*

For the reasons set forth above, the court denies Defendant Steven R. Jakubowski's motion to dismiss the complaint against him. The court instructs the parties to discuss settlement before the next court date.